IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

_____

| | | |
|---|---|---|
| JOSEPH DESCHON, | ) | Cause No. CV 09-05-H-DWM-RKS |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATIONS |
| | ) | OF U.S. MAGISTRATE JUDGE |
| MIKE FERRITER; MIKE | ) | |
| MAHONEY; ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| MONTANA, | ) | |
| | ) | |
| Respondent. | ) | |

_____

On February 12, 2009, Petitioner Joseph Deschon filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner is a state prisoner proceeding pro se.

**I. Preliminary Screening**

Rule 4 of the Rules Governing Section 2254 Cases in the United States District

Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading.  The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court."  Id.  If summary dismissal is not warranted, the judge must order the respondent to file an answer, motion, or other response or "to take other action the judge may order."  Id.

## II. Background

In the fall of 1999, Petitioner let his nephew James Azure, Azure's girlfriend Cheryl Gouge, and her two-year-old son stay with him in his apartment.  Azure was a large man, over six feet tall.  Postconviction Appeal Br. ("PCR Br.") at 10, Deschon v. State, No. DA 06-610 (Mont. Feb. 23, 2007).[1]  Petitioner is 5'2" tall and of medium build.  CON Network, http://app.mt.gov/conweb (accessed Apr. 30, 2009).  Gouge told Petitioner about an occasion when Azure had beaten her, breaking ribs and inflicting an eye injury.  Id. at 4-5.

On November 6, 1999, Petitioner, Azure, and Gouge were drinking, socializing, and playing cards at a friend's house.  "There was noticeable tension between [Petitioner] and Azure when the three left at six that evening."  State v.

---

[1]  This document is attached to the Petition as an exhibit.  Page numbers refer to the footer in the brief, not CM-ECF page numbers.

Deschon, 40 P.3d 391, 393 ¶ 6 (Mont. 2002) ("Deschon I"); see also Deschon v. State, 197 P.3d 476, 479 ¶ 5 (Mont. 2008) ("Deschon III").   After a few more drinks at Petitioner's apartment, Petitioner and Azure began arguing.  Petitioner asked Azure to leave.  Azure left for about an hour and then returned.  The argument rekindled.  Petitioner again asked Azure to leave.  Azure again left for about an hour, then returned.  A neighbor testified that Petitioner was yelling at Azure to leave, and when she asked Petitioner to keep it down, Azure yelled profanities at her.  Deschon I, 40 P.3d at 393 ¶ 6.

While Gouge was in another room with her two-year-old son, a fight broke out between Petitioner and Azure.  According to Petitioner, Azure punched him, causing him to fall into a kitchen counter and lacerate his face, and he "grabbed what was there" to defend himself.  Deschon III, 197 P.3d at 479 ¶ 6; Deschon I, 40 P.3d at 393 ¶ 7.  Gouge testified that she heard something break.  She looked into the room and saw Petitioner punch Azure.  She then saw blood on Azure's shirt.  Azure was pale and said he couldn't breathe.  Petitioner told Gouge to call 911 as he began to administer CPR to Azure.  Deschon I, 40 P.3d at 393 ¶ 7.

At the hospital, surgeons discovered a hole in Azure's heart.  Although they patched it, he had already experienced irreversible brain damage.  About a week later, Azure's family decided to remove him from life support.  The medical examiner

determined that Azure died from complications of a stab wound to the chest.  Id. at 393 ¶ 8.

On November 19, 1999, Petitioner was charged in Montana's First Judicial District Court, Lewis and Clark County, with deliberate homicide.[2]  Randi Hood and Jeremy Gersovitz were appointed to represent him.  Deschon I, 40 P.3d at 393 ¶ 10.

During trial preparation, Petitioner told Hood that he knew Azure had assaulted Gouge, breaking her ribs and injuring one of her eyes.  He told Gersovitz that he was "scared because of [Azure's] size" and what Azure had done to Gouge "and others."  PCR Br. at 8.  Petitioner also told Gersovitz he was feeling "irritable and confused," was having problems getting his medication in jail, had "[h]ad a lot of head injuries" in the past and had only "short term memory because of drug use."  Id.

Hood and Gersovitz believed that investigating Azure's violent acts and reputation for violence would lead to admissible evidence only if Petitioner knew about the acts or Azure's reputation before the fatal fight.  Hood was "concerned that, because of her pressure, [Petitioner] might provide false information about [Azure's] violent past.  She did not seek out information from other witnesses about their opinion of [Azure's] character because she did not believe that it would have been

---

[2]  Petitioner spat on one of the officers who arrested him.  He was charged with assault with bodily fluids and pled guilty on the morning of trial.  Deschon I, 40 P.3d at 393 ¶ 10; Deschon II, 85 P.3d at 758 ¶ 5.

admissible." Id. at 9.

Had Hood and Gersovitz investigated Azure's background, they would have heard of two relevant specific instances of Azure's conduct. In 1998, Azure grabbed a screwdriver and held it to Petitioner's neck. The incident was stopped when a police officer happened to knock at the door, and a third person was arrested on outstanding warrants. That person, Yolanda Pocha, also said that, in her opinion, Azure was aggressive and violent when he was drinking, and she "believed that he could really hurt somebody." Id. at 10-11. Another relative of both Petitioner and Azure, Kim Burford, referred to summer 1999 incident, in Petitioner's presence, in which Azure picked a man up and "threw him to the ground like a football." Id. at 13. Pocha and Burford were at the hospital when Azure was stabbed and available to defense counsel before trial. Postconviction Reply Br. ("Reply") at 8-9, Deschon, No. 06-0610 (Mont. filed June 18, 2007). Petitioner did not tell defense counsel of these incidents and has not produced any evidence that he remembered them on November 6, 1999. PCR Br. at 8.

Throughout the proceedings against Petitioner, Gersovitz represented a defense witness, William Lawrence, on pending charges of felony domestic abuse. Defense investigator Thomas Mangan interviewed Lawrence before trial. Lawrence also met before trial with a deputy county attorney to discuss his testimony in Petitioner's case.

Gersovitz was not present.   Lawrence told Gersovitz afterward that he was intimidated by the deputy county attorney and was worried that his trial testimony might negatively affect plea negotiations in his own case.  Deschon I, 40 P.3d at 393-94 ¶ 12.

Two months after Petitioner was charged, on January  18, 2000, trial commenced.  PCR Br. at 1; Deschon III, 197 P.3d at 758 ¶ 5.  Lawrence testified that he talked to Azure at a bar on the evening of November 6.  Azure, whose knuckles were bloody, told Lawrence that he had "just got done kicking the shit out of" Petitioner.  Azure was intoxicated.  On cross-examination, the State attempted to impeach Lawrence with a statement he made to a detective, in which he said that he met Azure at an apartment, not a bar.  Lawrence insisted it was a bar and said the detective made a mistake.  In redirect, Lawrence testified that Azure said, as he was leaving the bar, that he was going to pick up Gouge and beat Petitioner up again.  In rebuttal, the State called the detective, who testified that Lawrence told him the encounter with Azure took place at his apartment.  Deschon III, 197 P.3d at 479-80 ¶ 12.

Lawrence had told Mangan that he met Azure at a bar.  Mangan could have testified to his prior consistent statement.  Hood and Gersovitz did not call Mangan in rebuttal because they believed the central points of Lawrence's testimony – that

Azure was intoxicated and intended to beat up Petitioner – were not affected by the inconsistent statement reported by the detective.  Id. at 480 ¶ 13.

In closing argument, the prosecution argued that it was Petitioner, not Azure, who was "on the fight":

> Now is that the behavior of a person who is defending himself?  Or is it the behavior of a person who was the aggressor in this incident?  Is that the behavior of a person who, after the[y] wrestled around and [Azure] is standing and facing the center of the room, grabs a knife and comes up an[d] stabs him from the side?
> . . .
> William Lawrence.  Ms. Hood says, well, what's important is what Lawrence said.  Well, what's important is that Lawrence is mistaken.  He's got the wrong night.  His story doesn't fit anybody's evidence.  Oh.  Lawrence is telling you a lie.

PCR Br. at 16-17.

The jury convicted Petitioner of deliberate homicide.  He was sentenced to serve fifty years, with ten suspended, for deliberate homicide, an additional five years for use of a weapon, and one year on the assault charge to which he pled guilty.  Deschon I, 40 P.3d at 394 ¶ 13.

Petitioner appealed.  On January 30, 2002, the Montana Supreme Court rejected his claim that Gersovitz had a conflict of interest with respect to Lawrence that affected the adequacy of Petitioner's representation.  Another claim was remanded to the trial court for further proceedings.  Id. at 395 ¶ 21, 396 ¶ 32.  On

February 18, 2004, the court disposed of additional claims, and the direct appeal was concluded.  State v. Deschon, 85 P.3d 756, 765 ¶¶ 42-43 (Mont. 2004) ("Deschon II").

With the assistance of counsel, Petitioner filed a postconviction petition in the trial court.  The petition was denied.  Petitioner appealed, arguing that trial counsel were ineffective because they did not adequately investigate and present evidence of Azure's propensity for violence and because they did not call Mangan to rehabilitate Lawrence's testimony following the State's rebuttal.  On November 18, 2008, the Montana Supreme Court affirmed the denial of postconviction relief.  Deschon III, 197 P.3d at 482 ¶ 32.

Petitioner signed his federal habeas petition and deposited it in the prison mail system on February 11, 2009.  See Pet. (doc. 1) at 6, Pet'r Decl. ¶ C; Houston v. Lack, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

## III. Petitioner's Allegations

Petitioner claims two violations of the Sixth Amendment right to the effective assistance of counsel.  Each of his claims refers to attached portions of the briefs he submitted on direct appeal and on postconviction appeal.  First, he asserts that Gersovitz had a conflict of interest that prevented him from effectively questioning Lawrence and rehabilitating his testimony.  Pet. at 4 ¶ 15A.  Second, he contends that

Gersovitz and Hood failed to make an adequate investigation of Azure's "reputation for violent conduct and specific instances of violent conduct." Id. at 4 ¶ 15B.

## IV. Analysis

### A. Merits Analysis in Federal Habeas Cases

Although some or all of Petitioner's claims may be barred on procedural grounds, such as the federal statute of limitations, it is clear that he is not entitled to relief on the merits of his claims. Accordingly, it is more efficient to proceed to the merits. 28 U.S.C. § 2254(b)(2); Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); Gutierrez v. Griggs, 695 F.2d 1195, 1198 (9th Cir. 1983).

The Montana Supreme Court considered both of Petitioner's claims on the merits. Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner may obtain relief if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

A state court decision is "contrary to [the Supreme Court's] clearly established

precedent if the state court applies a rule that contradicts the governing law set forth in [its] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.  In sum, a federal court sitting in habeas must be convinced that the state court's decision is "more than incorrect or erroneous."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).  The state court's decision must be "objectively unreasonable."  Id.

Federal habeas jurisdiction lies only for petitioners who allege that they are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

**B. Lawrence's Testimony**

To warrant relief based on defense counsel's conflict of interest, a habeas petitioner must show that "a conflict of interest actually affected the adequacy of his representation."  Mickens v. Taylor, 535 U.S. 162, 168 (2002) (describing the holding of Cuyler v. Sullivan, 446 U.S. 335 (1980)).

On direct appeal, Petitioner asserted that Gersovitz "could have reduced the

impact" of the inconsistency between Lawrence's trial testimony and his statement to the detective by asking Lawrence to explain the statement in direct examination. He claimed that Gersovitz was prevented from doing this because it "would have required Gersovitz to impeach his own client on the stand.  Such a maneuver never fosters trust between the client and an attorney."  Opening Br. at 15, <u>State v. Deschon</u>, No. DA 00-292 (Mont. Oct. 23, 2000).[3]  Petitioner also argued that Gersovitz did not ask Lawrence whether he felt intimidated by the deputy county attorney who interviewed him because Lawrence's plea agreement was in the balance.  <u>Id.</u> at 16-19.

The Montana Supreme Court decided that, "[e]ven if Lawrence had different counsel, he would still have been in the position of testifying in one criminal trial while negotiating a plea in another.  Lawrence did, in fact, testify and his testimony did, in fact, support Deschon's defense that Azure was the aggressor."  <u>Deschon I</u>, 40 P.3d at 395 ¶¶ 19-20.  This conclusion is objectively reasonable.

As for Petitioner's claim that counsel should have called Mangan to support Lawrence's credibility, the Montana Supreme Court decided that counsel's decision not to do so was not "so unreasonable as to fall below an acceptable standard of legal representation."  <u>Deschon III</u>, 197 P.3d at 482 ¶ 31.  That decision, too, was

---

[3]  This document is attached to the Petition as an exhibit.  Again, page numbers refer to the footer in the brief, not CM-ECF page numbers.

objectively reasonable.  As the court pointed out, counsel thought Lawrence was a credible witness and the discrepancy as to whether Lawrence met Azure at a bar or at his apartment was insignificant.  Id. ¶ 30.  To find, under these circumstances, "not only that [Gersovitz's] performance was deficient, but that any disagreement with that conclusion would be objectively unreasonable" would give "too little deference to the state courts that have primary responsibility for supervising defense counsel in state criminal trials."  Yarborough v. Gentry, 540 U.S. 1, 11 (2003).  Petitioner's claims regarding a conflict of interest as to Lawrence's testimony should be denied.

## C. Investigation of Azure's Violent and Aggressive Character

Strickland v. Washington, 466 U.S. 668 (1984), sets the standards with respect to claims alleging ineffective assistance of counsel.  First, Petitioner must show that counsel's performance fell below an objective standard of reasonableness.  Id. at 687-88.  Under the first prong, counsel's performance need not be perfect.  It must, however, fall "within the range of competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397 U.S. 759, 771 (1970)).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Strickland, 466 U.S. at 690-91.

"[T]here is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Petitioner argued that counsel did not effectively prepare his defense. He claimed they should have done a more thorough investigation to uncover character evidence about Azure that could have been admitted at trial.

In his Reply on postconviction appeal, Petitioner asserted that he "obviously" knew about the 1998 incident in which Azure held a screwdriver to his neck, as well as an incident in which Azure picked a man up and threw him on the ground, because he was present when these things happened. Reply at 8-10, Deschon, No. 06-0610 (Mont. filed June 14, 2007). However, Petitioner did not tell Hood or Gersovitz about these incidents, and he adduced no evidence in postconviction proceedings that he remembered them when he confronted Azure on November 6, 1999. On the contrary, he had significant memory problems. PCR Br. at 8-9. Therefore, to the extent Montana law required Petitioner to show he knew about these incidents, he was unable to muster the evidence.

Consequently, Petitioner's argument depends entirely on his claim that Hood and Gersovitz misunderstood Montana law on the admissibility of evidence of the victim's character. The Montana Supreme Court held that Hood and Gersovitz

correctly understood at least some of the applicable law:

> DeSchon's interpretation of Montana law regarding the admissibility of evidence *showing reasonableness of force* is incorrect. Evidence of a victim's character is admissible when it is an essential element of a claim or when it relates to the reasonableness of force used by the accused. Evidence of a violent character is not an "essential element" of a justifiable use of force defense. Evidence of the violent nature of the alleged victim of an assault is limited to what the defendant knew at the time he used force against the victim, and it is also required that the defendant show this knowledge led him to use the level of force he did.

Deschon III, 197 P.3d at 481 ¶ 24 (emphasis added) (discussing State v. Montgomery, 112 P.3d 1014, 1018 ¶¶ 19-20 (Mont. 2005)) (internal citations omitted); see also City of Red Lodge v. Nelson, 989 P.2d 300, 303 ¶ 19 (Mont. 1999) (holding evidence of victim's prior convictions inadmissible to show reasonableness of force used where defendant did not allege he knew of them at the time he used force against her); State v. Logan, 473 P.2d 833, 842 (Mont. 1970) (holding that defendant must show he knew of victim's reputation for violence to support reasonableness of force used), both cited in PCR Br. at 6.

As to the reasonableness of the force used, Montana law is clear and consistent with the restatement in Petitioner's case quoted above.

Petitioner's brief on postconviction appeal simply stated, in some parts of the brief, that the identity of the aggressor was disputed, PCR Br. at 4, 16-17, and, in other parts of the brief, that evidence of the victim's character is admissible, id. at 21-

23, 25-28.  He made no attempt to distinguish among the purposes for which such evidence may be offered and the accompanying distinction between evidence of which the defendant must be aware and evidence that need not be known to the defendant.  Two of the cases Petitioner cited addressed only evidence relating to the reasonableness of the force used.  Montgomery, 112 P.3d at 1018 ¶¶ 18-19; Nelson, 989 P.2d at 303 ¶ 19, cited in PCR Br. at 22, 26.  The defendant must be aware of such evidence, and, as set forth above, Petitioner did not make a factual showing on that point.

Petitioner also cited two other cases, State v. Sattler, 956 P.2d 54 (Mont. 1998), and Logan, along with Nelson, for the proposition that Hood's and Gersovitz's "self-imposed limitation on the admissibility of [Azure's] propensity for violent and aggressive behavior was too restrictive."  PCR Br. at 26.  He failed to explain how the cases he cited supported his claim.  He failed to make any legal analysis at all, either of those cases or of the legal proposition on which his argument depended.

Sattler expressly precludes the admission of specific instances of the victim's conduct to show that the victim was the aggressor.  956 P.2d at 64 ¶ 45.  After Sattler, specific instances of the victim's conduct are admissible only to show the reasonableness of the defendant's fear of the victim or the reasonableness of the force used.  There is no doubt that the defendant must know of any specific instances of the

victim's conduct that are offered to show the reasonableness of the defendant's fear or the reasonableness of the force used to repel the victim. Therefore, Hood and Gersovitz did not misunderstand what Montana law required.

The fact that Hood and Gersovitz accepted the parameters of Montana law does not mean that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. They accurately understood Montana law insofar as it is clear, and they did not unreasonably misread it where it is less than clear. Their performance was within "the wide range of professionally competent assistance." Id. at 690. The Montana Supreme Court's decision that they were not ineffective was objectively reasonable.

## V. Respondent

The proper respondent to a habeas petition is the person who has immediate custody of the petitioner. Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004). Based on 28 U.S.C. § 2252 and Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, it is also customary to name the Attorney General in the caption of the case. Here, Petitioner was in custody at Montana State Prison when he filed his petition, and he remains there. Mike Ferriter, the Director of the Montana Department of Corrections, is not a proper Respondent. He should be dismissed.

## VI. Certificate of Appealability

### A. Governing Law

Pursuant to 28 U.S.C. § 2253(c), "[a] certificate of appealability ['COA'] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  See Hohn v. United States, 524 U.S. 236 (1998); Lambright v. Stewart, 220 F.3d 1022, 1024 (9th Cir. 2000).   The standard of a "substantial showing" can be satisfied on an issue-by-issue basis.  Lambright, 220 F.3d at 1024 (citing 28 U.S.C. § 2253(c)(3)).

> [I]n order to make a substantial showing of the denial of a federal right a petitioner . . . "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'"

Lozada v. Deeds, 498 U.S. 430, 432 (1991) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).  See also Slack v. McDaniel, 529 U.S. 473, 484 (2000) (petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."). Any doubt as to whether a petitioner has met the standard is resolved in his favor.  Lambright, 220 F.3d at 1025.  The Court must "state why a certificate should not issue."  Fed. R. App. P. 22(b)(1) (emphasis added).

**B. Discussion**

Petitioner fails to show either that counsel had an actual conflict of interest based on his simultaneous representation of a defense witness or that counsel's performance was affected by any conflict.  The witness testified favorably to the defense and consistently with his pretrial statement to a defense investigator.  Asking the witness whether he felt intimidated by the deputy county attorney in his pretrial interview could have undermined the witness's credibility by inviting rebuttal testimony to show that the State is not legally permitted to punish a witness for truthful testimony.  Finally, counsel's decision not to recall its investigator to testify about the witness's prior consistent statement was based on counsel's belief that the witness was credible and their assessment that the discrepancy between whether the witness met the victim at an apartment or at a bar was not important.  Petitioner cannot meet the high burden of showing that the Montana Supreme Court made an objectively unreasonable decision that counsel's performance was not deficient.

Petitioner also fails to show that counsel misunderstood Montana law on the admissibility of character evidence about a victim.  Petitioner failed to adduce evidence showing that he knew of the specific instances of the victim's conduct he now says should have been introduced.  Montana law clearly requires that showing.  Although ambitious defense counsel might someday persuade the Montana Supreme

Court to reconsider the matter, counsel correctly understood Montana law where it is clear, and where it is not clear, counsel's understanding was not unreasonable. Again, Petitioner cannot meet the high burden of showing that the Montana Supreme Court made an objectively unreasonable decision that counsel's performance was not deficient.

Because Petitioner has not made a substantial showing that he was deprived of a constitutional right, a COA is not warranted.

Based on the foregoing, the Court enters the following:

<strong>RECOMMENDATION</strong>

1.   Respondent Ferriter should be DISMISSED and his name should be removed from the caption of the case.

2.  The Petition (doc. 1) should be DENIED on the merits.

3.   The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

4.  A certificate of appealability should be DENIED.

<strong>NOTICE OF RIGHT TO OBJECT TO<br>FINDINGS & RECOMMENDATIONS<br>AND CONSEQUENCES OF FAILURE TO OBJECT</strong>

Pursuant to 28 U.S.C. § 636(b)(1), Petitioner may serve and file written

objections to these Findings and Recommendations within ten (10) business days of the date entered as indicated on the Notice of Electronic Filing.  A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations.  Failure to timely file written objections may bar a de novo determination by the district judge.

Petitioner must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."  Failure to do so may result in dismissal of his case without notice to him.

DATED this 19th day of May, 2009.


 /s/ Keith Strong                                   
Keith Strong
United States Magistrate Judge